UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FIRST ACT INC.<br><br>Plaintiff<br><br>v.<br><br>KIDZ TOYZ, INC. and<br>CHRISTMAS TREE SHOPS, INC.<br><br>Defendants | Civil Action No. _____<br><br>03-12507 EFH |

## MEMORANDUM IN SUPPORT OF
## FIRST ACT'S MOTION FOR PRELIMINARY INJUNCTION

In the first half of this year, plaintiff, First Act Inc. ("First Act"), held discussions with defendant Christmas Tree Shops, Inc. ("Christmas Tree") about having that retail chain carry certain First Act products, including the "Junior Quartet" musical set. The Junior Quartet contains an unusual combination of instruments for young children: a tambourine, a triangle, and two jingle sticks. The instruments are arranged in a fanciful configuration within a box specially designed to resemble a stage. Although Christmas Tree was interested in carrying Junior Quartet, First Act could not meet the extremely low unit price that Christmas Tree demanded. Thus, the two companies did not strike a deal.

Just last month, First Act was dismayed to learn that Christmas Tree was carrying Junior Quartet after all, only it was not First Act's product. Instead it was a startlingly blatant knock-off made by defendant Kidz Toyz, Inc. ("Kidz Toyz"). First Act had left a sample of Junior Quartet with Christmas Tree when they were discussing a possible deal. The Kidz Toyz set not only copies the choice and arrangement of the instruments seen in Junior Quartet, but uses the

SCANNED
DATE: _____
BY: _____

identical stage-like packaging. What is more, the Kidz Toyz jingle sticks are replicas of First Act's, right down to such arbitrary details as the choice of material, shape and size of the sticks, number and arrangement of bells, and use of criss-crossing ribbons.

First Act asks the Court to preliminarily enjoin the defendants from making and selling their knock-off of Junior Quartet and continuing to infringe the trade dress of First Act's packaging and jingle sticks.

## I.     FACTUAL BACKGROUND

First Act is a Newton-based company that designs and makes musical instruments for children and young adults, ranging from simple percussion instruments to band instruments. First Act also offers hand-crafted electric guitars for professional musicians. *See* Declaration of Mark S. Izen , attached hereto as Exhibit A, ¶ 1.

### A.     Design and development of Junior Quartet

First Act designs and sells the FirstAct Discovery$^{TM}$ line of affordable musical instruments geared for children ages 4-10. One of the items First Act sells in this line is the Junior Quartet, a boxed set of four instruments: a tambourine, a triangle, and two jingle sticks. *Id.* at ¶ 4. First Act has invested heavily in the design and development of attractive packaging for the Junior Quartet. *Id.* at ¶ 9.

### B.     Distinctive packaging of Junior Quartet

The Junior Quartet has always been sold in a distinctive package resembling a stage, which plays on First Act's name. The invariable configuration has the tambourine sitting on a small stage in the center, flanked by the jingle sticks, with the triangle positioned in front of and partly below the tambourine. The triangle is bisected by its metal striker. Atop the stage, a panel

2

is inscribed "First Act Junior Quartet." At the bottom, a panel reads "Junior Tambourine ● Junior Triangle ● Jingle Sticks". *Id.* at ¶ 5. A photograph of the package appears as Exhibit A to Complaint.

The jingle sticks are also distinctively designed. Each has a rounded and tapered handle incised with three grooves and imprinted with the "First Act" name. The upper portion of the stick is of greater and uniform circumference than the handle and is incised with six grooves. This upper portion features four columns of three bells each, and a single bell on top. A ribbon criss-crosses the upper portion two times. The use of a ribbon as a design element in this context is an original idea of First Act's. *Id.* at ¶ 6.

Because the packaging is designed to keep the instruments visible, the distinctively embellished jingle sticks and the arbitrary arrangement of the instruments are essential contributors to the overall commercial impression of Junior Quartet. *Id.* at ¶ 7.

C.   **Commercial Success of Junior Quartet**

First Act began selling the Junior Quartet in late 2000, and has sold many tens of thousands of units in those three years. First Act markets these instruments through mass merchandisers, discount retailers and wholesale clubs, such as Wal-Mart, Target, and BJ's, respectively. Due to our extensive promotion of the product, its distinctive design, and its commercial success in popular stores, consumers recognize the packaging and jingle sticks and associate them with First Act. *Id.* at ¶¶ 3, 10.

D.   **First Act introduces the product to Christmas Tree**

In January 2003, a First Act sales representative solicited Christmas Tree's interest in carrying a number of First Act products, including the Junior Quartet. *See* Declaration of Jay

3

Macken, attached hereto as Exhibit B, ¶¶ 2-4. When the sales representative met with a senior buyer for Christmas Tree in March 2003, Christmas Tree expressed interest in four First Act products, including the Junior Quartet. *Id.* at ¶ 6.

The parties did not agree on a price per unit that Christmas Tree would pay First Act for the products, but the representative left samples of the Junior Quartet and the other items of interest. *Id.* at ¶¶ 8-9. After several communications between the First Act representative and Christmas Tree's buyer, culminating in a June 2003 meeting, it appeared that First Act could not meet the very low price that Christmas Tree required. *Id.* at ¶ 10.

### E. Christmas Tree sells "Center Stage," a knock-off of Junior Quartet

A few weeks ago, in November 2003, First Act learned that Christmas Tree was advertising a "4 pc. music play set." A First Act employee bought the advertised item for $9.99, several dollars less than the suggested retail price for the Junior Quartet. It is called Center Stage and is manufactured by Kidz Toyz. Izen Decl., ¶ 11. The Center Stage play set copies Junior Quartet, right down to the packaging, choice and arrangement of instruments, and design of the jingle sticks.

### F. Center Stage slavishly copies Junior Quartet

As with Junior Quartet, the Kidz Toyz package resembles a stage, and the same arbitrary choice of instruments are presented exactly like First Act's: The tambourine sits on a small stage in the center, flanked by the jingle sticks, with the triangle positioned in front of and partly below the tambourine. The triangle is bisected by the metal striker. The panel below the stage even identifies the instruments in the same order as the bottom panel of First Act's: "• Tambourine •

4

Triangle • Jingle Sticks". A photograph of the Kidz Toyz package appears at Exhibit B to the Complaint, and a side-by-side comparison at Exhibit C.

The product name, Center Stage, not only appropriates the theatrical image of First Act's name, but appears on the package exactly where "First Act" appears on the Junior Quartet package. The predominantly purple packaging copies one of the two distinctive colors of First Act's packaging. The yellow accents copy the other.

In addition, the Kidz Toyz jingle sticks are modeled precisely after First Act's. They are made of wood, and each has a rounded and tapered handle incised with three grooves and imprinted with the product name. The upper portion of the stick is of greater and uniform circumference than the handle and is incised with six grooves. This upper portion features four columns of three bells each, and a single bell on top. A ribbon criss-crosses the upper portion two times.

### G.   Likelihood of confusion between Junior Quartet and Center Stage

The two musical sets present a high likelihood of confusion because they appear to be nearly identical, and have the same major features. Indeed, Center Stage contains all of the distinctive features of both the Junior Quartet packaging and the jingle sticks, as described above. Both sets are priced between $10 and $15 per unit, and are sold in the same channels of trade to the same class of consumers. Both are low-cost impulse items that consumers are likely to purchase without making a careful inspection. Finally, both are advertised in similar media, such as newspaper inserts and flyers. Izen Decl., ¶¶ 9, 11.

## II.   ARGUMENT

In determining whether a preliminary injunction should issue, a court must consider (1) the moving party's likelihood of success on the merits; (2) whether the moving party will be irreparably injured by denial of relief; (3) the balance of equities between the parties; and (4) the public interest, if any, in the outcome. *New Comm Wireless Serv., Inc. v.SprintCom, Inc.*, 287 F.3d 1, 8-9 (1st Cir. 2002) (the first factor is of greatest significance).

### A.   First Act is Likely to Succeed on the Merits of its Claims for Infringement of the Trade Dress of Its Packaging and Jingle Sticks

The Center Stage musical set is a blatant knock-off of First Act's Junior Quartet. Because the infringing product is likely to cause confusion in the marketplace, First Act's likelihood of success on the merits of its claims for trade dress infringement is overwhelming. Trade dress inheres in an "arrangement of identifying characteristics or decorations" associated with a product that is "intended to make the source of the product distinguishable from another and to promote its sale." *Chrysler Corp. v. Silva*, 892 F. Supp. 321, 323 (D. Mass. 1995). Section 43(a)(1) of the Lanham Act, codified at 15 U.S.C. §1125(a)(1), prohibits infringement of trade dress, which is the "total image and overall appearance" of a product. *Id.*

To establish infringement of its product packaging and jingle stick trade dress, First Act must show (1) that the packaging and jingle sticks are either inherently distinctive or have acquired a secondary meaning; (2) that prospective purchasers are likely to be confused as to the source of the "Center Stage" product; and (3) that the packaging design and jingle sticks are non-functional. *Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp.2d 130, 133 (D. Mass. 2003), citing *Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 210-15 (2000). First Act can readily show infringement of its trade dress.

### 1. The Junior Quartet packaging has acquired secondary meaning

First Act can establish secondary meaning by showing that a significant number of consumers understand the packaging of Junior Quartet and the design of the jingle sticks to refer exclusively to First Act. *TEC Engineering Corp. v. Budget Molders Supply, Inc.*, 927 F. Supp. 528, 533-534 (D. Mass. 1996). Factors demonstrating secondary meaning are (1) long and exclusive use; (2) evidence of extensive advertisement and promotion; and (3) evidence of successful sales of the product. Evidence that the defendant copied the trade dress "down to the smallest detail" is additional support for a finding of secondary meaning. *Id.* at 534. Each of these factors weighs heavily in favor of finding secondary meaning in the Junior Quartet package design.

First Act completed development of the distinctive Junior Quartet packaging and jingle stick design in 2000. For over three years, it has marketed the musical set in the same packaging. Izen Decl., ¶ 10. Until defendants introduced the "Center Stage" set in 2003, no other musical set was known to have the same overall combination and arrangement of specific features that make up the total image of the Junior Quartet. *Id.*, ¶ 17.

First Act has invested substantial time, effort and money developing the packaging for Junior Quartet, retaining expertise in the areas of package design, product development and graphic design to create a distinctive look. *Id.*, ¶ 9. The set has been the subject of print advertising which has invariably featured depictions of its distinctive arrangement of instruments in a stage-like package. *Id.* The success of the Junior Quartet, from the moment of its introduction to market, was immediate and substantial. First Act has sold many tens of thousands of units. *Id.*, ¶ 10.

In bringing Center Stage to market, the defendants unmistakably copied Junior Quartet down to the smallest detail. They chose to use all of the following highly arbitrary features of First Act's distinctive packaging: The use of a package with identical dimensions, panels and hang-tab; the particular choice of instruments; the arrangement of those instruments; the display of instruments in the context of a stage; the placement of a stage-evocative name (Center Stage/First Act) in the same position on the package and on the jingle sticks; and the predominantly blue-purple package color. As for the jingle sticks, the copying is so exact that defendants' product is not only made of the same color wood but even features the adornment of the sticks with nine incised grooves, thirteen bells, and a criss-crossing ribbon.

### 2. The public is likely to confuse the two musical sets

Likelihood of confusion is the key element in an infringement action. *TEC Engineering*, 927 F. Supp. at 534. The First Circuit prescribes that the following eight factors be considered in determining likelihood of confusion: (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting the mark; and (8) the strength of the plaintiff's mark. *Id.* at 534, citing *Boston Athletic Assoc., v. Sullivan*, 867 F.2d 22, 29 (1st Cir. 1989). Virtually all of these factors weigh heavily in First Act's favor.

The trade dress of the two musical sets is readily seen to be nearly identical. Both are priced in the $10 to $15 range. Both are sold in the same channels of trade, namely, in retail stores, to the same class of consumers. Both musical sets appear to be advertised in similar channels, such as newspaper inserts and flyers. Izen Decl., ¶¶ 9, 11. First Act's exclusive use of

the distinctive packaging and jingle sticks for more than three years (until Defendants began marketing Center Stage this year) and First Act's constant promotion of Junior Quartet by reference to its distinctive appearance underscore the strength of the trade dress.

Defendants' copying of the Junior Quartet and the jingle sticks down to their minutest detail betrays its intent to capitalize on the popularity of that item. Christmas Tree's haste in bringing Center Stage to its shelves within months after First Act introduced Christmas Tree to the Junior Quartet product makes the wrongful intent unmistakable.

In sum, the totality of factors points overwhelmingly to the likelihood that consumers will confuse the defendants' Center Stage with the Junior Quartet. Defendants' slavish copying of First Act's package design makes it likely that consumers will conclude that there is a relationship between the two products. In this connection, the First Circuit has cited with approval the Second Circuit's holding that "when there is intentional copying of a product's trade dress, 'the second comer will be presumed to have intended to create a confusing similarity of appearance and will be presumed to have succeeded.'" *Boston Athletic Assoc.*, 867 F.2d at 34-35.

### 3. First Act's package design is non-functional

A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article," and a feature is non-functional "if it is merely an 'arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality.'" *TEC Engineering*, 927 F. Supp. at 533; *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 33 (2001).

The basic purpose of a package is to contain or display the marketed product. The number of actual or possible package designs, even limited to those for musical instruments, is virtually numberless. Over the years, scores of differently designed packages have been on the market. None of them, until the defendants introduced Center Stage, has borne a close similarity to First Act's stage-like packaging of a tambourine, triangle and jingle sticks. It is self-evident that the defendants did not need to copy the Junior Quartet packaging in order to market musical instruments, even if they wanted to market the combination of a tambourine, triangle and jingle sticks. The numerous features of First Act's packaging and jingle sticks that the defendants copied, as described above, fall within the category of arbitrary embellishment adopted for purposes of identification and individuality.

### B.    First Act Will be Irreparably Injured by the Denial of Injunctive Relief

Iirreparable harm flows from infringement of trade dress where likelihood of confusion is established. *Equine Technologies, Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 544 (1st Cir. 1995); *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 220 (1st Cir. 1989). As this Court observed in a similar case,

> [T]he likelihood that customers will be confused as to the source of [defendant's product] provides a "potent basis" for a finding of irremediable injury. In so ruling, this Court is cognizant of the First Circuit's observation that "[f]ew harms are more corrosive in the marketplace than the inability of a trademark holder to control the quality of bogus articles thought (erroneously) to derive from it. The threat to [plaintiff's] hard-won business and reputation made out a showing of irreparable harm to warrant immediate redress."

*TEC Engineering*, 927 F. Supp. at 535, quoting *Hypertherm, Inc. v. Precision Products, Inc.*, 832 F.2d 697, 700 (1st Cir. 1987).

First Act has made a clear showing that it will succeed on its trade dress claims. The Center Stage musical set is an egregious knock-off of the Junior Quartet and First Act's jingle sticks, conveying a substantially similar commercial impression and emulating nearly every one of their distinctive features. First Act has built up significant goodwill in the design of its packaging and jingle sticks since they first appeared on store shelves in 2000, and retailers and members of the consuming public across the country associate those designs with First Act. Every day in which the defendants are permitted to market and sell their infringing products, First Act's goodwill and reputation, built by long labor, investment and ingenuity, is being compromised. Thus, a preliminary injunction should issue forthwith.

C. **The Balance of Equities Favors First Act**

The strong likelihood of First Act's success on the merits weighs heavily against any loss to the defendants. *TEC Engineering*, 927 F.Supp. at 535, quoting *FAIC v. Elio*, 39 F.3d 1239, 1248 (1st Cir. 1994). In addition, First Act faces irretrievable loss of its investment in the design of its jingle sticks and packaging, and misappropriation of its goodwill if the defendants are permitted to continue their infringing conduct. Defendants, on the other hand, have only recently begun to market their infringing product. Thus, the disruption to the defendants' business caused by a preliminary injunction will be minimal.

Moreover, the defendants generate revenues by manufacturing and selling a diverse assortment of consumer and toy products, and will therefore suffer relatively little harm if a preliminary injunction as to the one musical set in question is granted. First Act, on the other hand, concentrates on the music business and Junior Quartet is one of its best-selling products. Thus, the balance of equities favors First Act and a preliminary injunction should issue.

The defendants' egregious copying of the smallest details of First Act's distinctive packaging and jingle sticks is another equitable factor weighing against them.

### D. The Public Interest is Served by Enjoining Defendants' Infringing Conduct

There is a strong public interest in preventing consumer confusion arising from the defendants' infringement of First Act's distinctive trade dress. *See, e.g., Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F. Supp. 994, 1015 (D. Mass. 1988). An injunction prohibiting further sale of the Center Stage product will protect the public from the confusion that will inevitably arise among retailers and consumers if the defendants are permitted to promote and sell their infringing products through retail channels. Hence First Act's motion for a preliminary injunction should be granted.

### III.   CONCLUSION

For the foregoing reasons, First Act respectfully requests that the Court grant its motion for preliminary injunction.

Dated:   December 12, 2003

FIRST ACT INC.

By its attorneys,

/s/ Joel R. Leeman
Joel R. Leeman (BBO# 292070)
Erik Paul Belt (BBO# 558620)
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, MA 02110-1618
Telephone:  (617) 443-9292

284166 2202/505